[No. 3223.]

SAM. ROCKHOLD v. THE STATE.

1. JURY LAW--PRACTICE.—A proposed juror is absolutely disqualified by answering that he has formed such an opinion of the defendant's guilt or innocence as would influence him in finding a verdict. It is only when he answers the qualifying question in the negative that he is required to be examined by the court as to how far his conclusions, however formed, will influence his action.

2. PRACTICE—EVIDENCE.—The difficulty which culminated in this homicide had its origin in trouble between a husband and wife, the wife, at the time of the homicide, being a guest of the deceased. Under the circumstances this court cannot hold improper the cross-examination of a wit-

K1

ness for the defense that sought to disclose the relations existing between the defendant and the wife.   See the opinion for the state of case.

3.  SAME—NEW TRIAL.—A verdict cannot be impeached by the affidavit of a juror; hence it was not error to overrule a motion for new trial based upon the affidavit of a juror that the jury misconstrued the charge of the court. .

4.  SELF-DEFENSE—MANSLAUGHTER.—CHARGE OF THE COURT instructed the jury as follows:   "But while the defendant had the legal right to protect himself from such actual or supposed attack without retreating, and to use all the force necessary for that purpose, even to the extent of slaying his adversary, and he may continue to use force until all danger, actual or apparent, has passed, he cannot use any more force than was necessary for that purpose; and should you believe beyond a reasonable doubt that the deceased did assault the defendant, but that he abandoned said assault, and it reasonably appeared to the defendant that he had ceased all violence toward him, and that afterward the defendant shot the deceased, he would be guilty of manslaughter."  *Held*, error, inasmuch as the charge, in effect, instructed that the jury must believe, beyond a reasonable doubt, that the deceased did assault the defendant before they could find the grade of manslaughter.   In other words, it reversed the rule which obtains in criminal cases, and applied the doctrine of reasonable doubt against, instead of in favor of, the defendant.   See the opinion *in extenso* on the question.

5.  SAME—REASONABLE DOUBT is a doctrine that should be applied to the case as sought to be established by the State, and not to a defense set up by the accused.   In this case if the jury believed the defendant was assaulted by the deceased, or if they had a reasonable doubt about it, the accused was entitled to that defense to the extent that they either believed or doubted the fact.

APPEAL from the District Court of Wise.   Tried below before the Hon. C. C. Potter.

Upon an indictment charging him with the murder of Joe Highlander, in Wise county, Texas, on the eleventh day of February, 1884, the appellant was convicted of murder in the second degree, and his punishment was assessed at a term of twenty-five years in the State penitentiary.

Sheriff Allen testified, for the State, that about nine o'clock on the night of February 11, 1884, the defendant came to him on the public square, in Decatur, and surrendered himself, saying that he had shot and, he thought, killed a man.   He told witness to go with him and he would show him the man.   Witness went with defendant to a point two or three hundred yards north of the northwest corner of the square, where the street from that corner crosses a ravine, and on the north side of the ravine, on the

east edge of the traveled part of the road, he found the dead body of Joe Highlander. His head lay north, the body on the right side. The right arm, to the elbow, lay under the body, and an open knife, with the point of the blade extending toward the body, was held, the witness could not say how firmly, in the deceased's hand. Three fresh gunshot wounds were on the body of the deceased, two in the breast and one in the head, the latter a glancing shot, ranging from the front back. The other two shots, apparently smaller than that in the head, entered the body in front, one above the other, and ranged straight. The clothing for two or three inches around the upper wound in the breast was powder stained. The body of the deceased was taken to the witness's office, and the defendant was jailed.

When the defendant surrendered, he told the witness that the deceased was trying to cut him with a knife, and that he had to kill him. He showed witness where his coat and shirt were cut. His coat was cut through the left lappel, the cut running angling toward the right breast, and cutting his shirt for several inches. The skin was not cut, but was slightly marked. The other cut was lower down and straight across the shirt. At the same time the defendant gave the witness two pistols, one a large forty-four or forty-five calibre, and the other a smaller one. On searching the defendant, the witness found in his pocket a pocket knife, much larger than that found in the hand of the deceased. In the coat pocket of the deceased was found a pipe and some tobacco, and a black handled pocket knife much larger than that found in his hand. The two knives were here exhibited, and the witness judged that the smaller knife (the one found in deceased's hand) would be more effective in a personal conflict, because much sharper at the point and edge. Witness did not think powder would burn at a greater distance than a foot or two from the muzzle of the pistol. The defendant was deputy city marshal of Decatur at the time of the killing, and was a candidate for marshal. The smaller of the pistols surrendered by the defendant had but two loads in it; the larger had but one empty chamber. Deceased was a much smaller man than the defendant.

Mrs. Highlander, the widow of the deceased, testified, for the State, that the defendant came to her house about dark on the evening of the killing and halloaed. Deceased went to the door, and defendant asked if Mrs. Wiseman was at the house, and asked to see her if she was. Mrs. Wiseman asked deceased to

go with her and hear what was said.  Deceased went, but shortly
returned.  In a short time Mrs. Wiseman was heard crying.
Deceased told witness to tell Mrs. Wiseman to go in the house.
Witness did so, and defendant asked permission to go into the
house and talk.  Permission was granted, and he went in.  The
discussion proceeded, and seemed to be something about Mrs.
Wiseman's contemplated departure from town.  Mrs. Wiseman
said she cried before coming in because she was afraid defendant
intended to kill her husband.  The talk was resumed by Mrs. Wise-
man in the presence of witness and deceased.  During the time
deceased and defendant took three drinks of whisky from a bottle
produced by defendant.  Finally defendant said, in effect, that if
Mrs. Wiseman would leave, he would see that she was furnished
necessary money; that her husband had imposed upon her long
enough.  The deceased, questioning defendant's right to inter-
fere in conjugal quarrels, took offense, and requested defendant
to leave the house.  Defendant left his seat, slapped his hand
on his pocket, and said: "Old man, are you mad ?  Do you want
a pistol ?"  The deceased replied: "If I did, I could get one."
The defendant then shook his fist under deceased's nose and said:
"G—d d—n you, do you see that ?"  Deceased replied: "Yes, I
see that."  Witness asked defendant then to leave the house.

The defendant went out at the front door, but, instead of go-
ing off, went to the back door and called Mrs. Wiseman, who
went to him.  They talked some little time, Mrs. Wiseman stand-
ing in the shed room door and defendant outside.  Witness went
to them and again asked defendant to leave, and he did so.  In
the meantime the deceased left the house, going toward Lewis's.
He returned shortly by the east gate, and called to the witness
in a loud voice, asking her what was the name of the officer
(defendant), and saying that he was going to town to procure
his arrest.  Witness tried, ineffectually, to dissuade him.  He
left, saying that he would be back soon.  Soon after the witness
got back into the house she heard three pistol shots in rapid suc-
cession, and she next saw her husband dead.

Mrs. Wiseman had been at the witness's house about a half
hour when the defendant came there that night.  She and her
husband, Henry Wiseman, separated about that time.  The
deceased had a black handled knife, a part of the handle being
broken off on one side.  Being shown the knife taken from the
pocket of the deceased, the witness identified it, and said that it
was the only knife owned by the deceased when killed.  De-

ceased had never owned the knife shown the witness as the one taken from his hand.

Miss Highlander testified substantially as did her mother, the last witness. She added that while playing with the knife recognized as the deceased's knife—the one found in his pocket—on that day, one of the children asked the deceased if he had another knife, and he said no.

Doctor M. L. York was the next witness for the State. The substance of his testimony was that, in his opinion, either of the breast wounds on the deceased was mortal. That on the head was not, being a glancing shot. He heard the three shots, and thought the first one the louder. The small knife in the deceased's hand was not gripped tightly. Whether a man being shot will retain a tight or a loose hold upon a knife held in his hand when shot, or drop it altogether, is a matter dependant entirely upon circumstances—upon the fact whether or not the shock produces contraction or relaxation of the muscles.

The substance of the testimony of J. J. Terrell was that the knife was held by the dead man very loosely—so loosely that if the hand had been turned over it would have fallen out. John B. Sanders testified, for the State, that some time during the previous fall, he lost a pocket knife on the square, similar in every respect to the one found in the hand of the deceased. The defendant was at that time deputy city marshal. The knife about which the wife of the defendant hereafter testifies was now exhibited to the witness, and he testified that it, too, was similar to the one he lost, except that the handle is broken. Mike Chambliss closed the evidence for the State by testifying that a few days before the killing he saw the defendant in possession of just such a knife as that found in the hands of the deceased. The defendant's knife was then exhibited to witness. That too, he testified, was similar to the one he saw in the defendant's possession.

R. M. Beville was the first witness for the defense. He testified that he heard the three shots, and thought the shot last fired was the loudest.

C. E. Lewis testified, in substance, that a few minutes before the shooting, the deceased came to his house and asked the loan of something to shoot with, saying that he wanted to protect himself from an officer who was misbehaving at his house. Witness advised him to report the affair to the sheriff, and he left,

saying he would do so. The three shots were fired a few minutes later.

. Bob Clark was the next witness for the defense. He testified, in substance, that he, Henry Wiseman and Mr. Jones were partners in the carpenter business. On the evening of the killing, the defendant came to witness's shop and said that he was hunting some of the firm; that Mrs. Wiseman had been to him that evening with a pitiful tale of abuse by her husband, and wanted his assistance in getting out of town, and asked what he should do. Witness told him that money had been left with him, witness, to get her to her people in Honey Grove. He replied that he would see her that night; that she had obtained two dollars from him under false pretenses, and he would force her to leave by threatening her with arrest. Witness told him to tell Mrs. Wiseman that if she would leave on the next train, he would have the necessary money ready for her. Defendant left the shop, saying that he would do as requested.

Cross-examined the witness said that he interested himself because he needed Wiseman's work, and Wiseman was drunk, and would not sober up as long as Mrs. Wiseman was in town. Witness did not know the cause of the Wisemans' separation. He had heard each attribute the fault to the other. Wiseman had told witness that his wife accused him of intimacy with Mrs. Highlander. He, Wiseman, had never, in witness's presence or hearing, accused his wife of adultery with the defendant. Witness did not know that an improper intimacy existed between defendant and Mrs. Wiseman.

Henry Prince testified, for the defense, in substance, that, as he was about closing his house of business on the night of the killing, the defendant ran into his store, very much excited, saying that he wanted to see whether or not he was cut. He found his clothes cut in the manner described by the sheriff. He told the witness, in substance, that he had been to Highlander's house, and a disagreement of some kind came up; that he started to town, and Highlander followed him; that he told Highlander to go back, as he was drunk, and it would be his duty to arrest him if he went to town in that condition; that Highlander said: "G—d·d—n you, I've got enough of this anyhow," and commenced stabbing at him, when he shot Highlander. Defendant asked what he had better do. Witness told him to surrender himself to the sheriff, and he and Ben. Allen, witness's clerk, went off together to hunt the sheriff.

Ben. Allen, for the defense, corroborated the evidence of Prince, and testified in addition that the defendant said the first two shots were fired from his small pistol, and that, as Highlander would not desist, he shot him the last time with the large pistol. He either said that he fired his last shot as the deceased was falling or after he fell—the witness was not certain which.

The wife of the defendant testified that on the second night before the killing, the defendant gave their little boy the small horn handled knife exhibited by counsel to other witnesses. After the examining trial the defendant sent witness word to secure and preserve that knife, as he thought it very similar to the one claimed to have been found in Highlander's hand. Witness secured it, and gave it to the counsel for the defense on the day of this trial. Part of the handle was broken off, by the child throwing it against a box, before witness received word to secure it.

Jerome Johnson, whose mother kept the Mansion house, testified that the deceased cooked at his mother's house a month before his death. Witness had often seen the deceased with different knives, sometimes as many as three at a time. He was a great hand to trade knives. Witness had never seen him in possession of such a knife as that said to have been found in his hand after his death.

The material part of the testimony of Mrs. Ollie Wiseman, introduced by the State, was that when Highlander called to his wife and asked the defendant's name, the defendant had just left her at the back or shed door, and could not have progressed far. She appealed to defendant that day for assistance to get home, which was the first time she had ever spoken to him. She got two dollars from him, which she had never returned; he had never asked for it.

The questions involved in the opinion were raised in the motion for new trial.

*Crane, Sparkman & Trenchard*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. No error is seen in the action of of the court in standing aside several of the talesmen who, in answer to the interrogatory whether, from hearsay or otherwise, there was established in their minds such a conclusion of the

guilt or innocence of the defendant as would influence them in finding a verdict, and to which each of the jurymen replied, "I have." The statute expressly declares that "if he (the juror) answer (this question) in the affirmative, he shall be discharged." (Code Crim. Proc., Art. 636, subdiv. 13.) It is only when he answers it in the negative that he is required to be further examined as to how his conclusion was formed, and the extent to which it will affect his action.   (Id.)

We are not prepared to say that the cross-examination of the witness Cook with regard to the relations subsisting between Mrs. Wiseman and the defendant was either irrelevant or illegal, when considered in connection with the other evidence. Mrs. Wiseman was at the deceased's house; the defendant went there to see her; they had an interview outside of the house; she was crying, and said that she was afraid the defendant would kill her husband.   The defendant said that he thought "her husband, Henry Wiseman, had imposed upon her long enough." The deceased took offense at this, and some sharp words ensued between the parties, and the deceased asked the defendant to leave his house.   Inasmuch, then, as the difficulty originated on account of the trouble between Wiseman and his wife, the defendant's interest in, and connection with, the matter, it seems, might be proper in shedding light upon the motives which induced his conduct and actions on the night of the homicide.

In support of the motion for a new trial, the defendant produced the affidavit of one of the jurors as to what was the construction placed by the jury upon the charge of the court.   Such affidavit was inadmissible for any purpose.   A verdict cannot be impeached in that manner.   "That the jury misunderstood the charge of the court, and were thereby misled in finding their verdict, is not recognized by the Code as cause for new trial.   No case has yet occurred in this State wherein the courts have tolerated affidavits of jurors made to impeach their verdicts.   If ever admissible, they can only be allowed in an extreme case, and under an imperative necessity for the accomplishment of justice." (*Johnson* v. *The State*, 27 Texas, 759.) In *Davis* v. *The State*, 43 Texas, 139, it was said: "There was no error in the refusal of the judge to permit, on the hearing of the defendant's motion for new trial, several of the jurors to be sworn to prove their misconstruction of the charge of the court. The permitting such a practice would result in greater evils than those that might possibly be removed by such action; and in

this case, when the life of the defendant was dependent upon their verdict, if any portion of the jury entertained any doubts as to the meaning of any part of the charge, the Code authorized, and it was certainly their duty to return to the court and obtain from the judge, such additional charge or explanation as the question required."

As part of the thirteenth paragraph of the charge by the court, the jury were instructed, in connection with the law of self-defense, as follows, viz: " But while the defendant had the legal right to protect himself from such actual or supposed attack without retreating, and to use all the force necessary for that purpose, even to the extent of slaying his adversary, and he may continue to use force until all danger, actual or apparent, has passed, he cannot use any more force than was necessary for that purpose, *and should you believe beyond a reasonable doubt that the deceased did assault the defendant*, but that he had abandoned said assault, and it reasonably appeared to the defendant that he had ceased all violence toward him, and that afterwards the defendant shot the deceased, he would be guilty of manslaughter." We have italicized the objectionable portion of this instruction.

In our opinion the instruction was calculated to mislead, if in fact it did not mislead, the jury into the belief that they must first find or believe beyond a reasonable doubt that the deceased did assault the defendant, before they could find the defendant guilty of manslaughter. In other words, the charge reverses the rule which should govern the action of juries in criminal cases. It is not necessary that they should believe beyond a reasonable doubt any fact essential to the establishment of a defense or a lower grade of crime. On the contrary, if they have a reasonable doubt of the existence of the facts essential to establish guilt, or to establish the higher grade of offense, the defendant is entitled to the benefit of such doubt. The jury should never be required to apply the reasonable doubt to the existence or non-existence of a defense before they should give the defendant the benefit of such defense. The reasonable doubt should be applied to the facts or to the case as sought to be established by the State.

To make the case one of manslaughter, under the supposed state of facts upon which the court was charging, the jury might have entertained a belief that deceased assaulted defendant, and yet that belief not be beyond a reasonable doubt. If

they did believe it, or if they had a reasonable doubt about it, in either event the defendant should have had the benefit of it to the extent to which they either believed or doubted the fact.

Because of this error in the charge of the court, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 25, 1884.